# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JAMES ADEYEMI,     :
           :
     Plaintiff,   :
           :
   v.       :   Civ. No. 04-1684 (CKK)
           :
DISTRICT OF COLUMBIA,   :
           :
     Defendant.  :

## MEMORANDUM OPINION

Plaintiff brings a claim of disparate treatment discrimination against the District of Columbia under the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12101 *et seq.*[1] Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 1.  He alleges that the District of Columbia Public Schools ("DCPS") "discriminated against [him] by not hiring [him] for the position of info. Tech. Specialist (Applications Software) . . . because of [his] disability as deafness."  Compl.  Plaintiff does not claim that DCPS failed to accommodate his disability.  DCPS moves for summary judgment on the ground that plaintiff produces no evidence of discrimination based on his disability.  *See* Defendant District of Columbia's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("Def.'s Mot.") at 14-15.  Having reviewed DCPS' motion, plaintiff's opposition, and the entire record of this case, the Court will grant the motion.

---

[1] Although the District of Columbia is the party defendant, for convenience, the Court will refer to the defendant as "DCPS."

## I.  LEGAL STANDARDS

### A.  Summary Judgment

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, DCPS, as the moving party, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted). Plaintiff, in response to DCPS' motion, must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 1999)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (abrogated on other grounds) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327). Accordingly, the Court reviews

the defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 880 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court will continue to grant a motion for summary judgment in which the nonmoving party has failed to submit documents that create a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

### B.  The Parties' Evidentiary Burdens

"In an ADA case with no direct evidence of discrimination and where the defendant denies that its decisions were motivated by the plaintiff's disability, this court applies the familiar burden-shifting framework" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Duncan v. Washington Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir.), *cert. denied*, 534 U.S. 818 (2001); *see Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997).  It is the district court's responsibility to adhere closely to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  To make out a *prima facie* case of discrimination under the ADA, plaintiff must prove that "he has a disability within the meaning of the ADA, that he was 'qualified' for the position with or without a reasonable accommodation, and that he suffered an adverse

employment action because of his disability." *Duncan*, 240 F.3d at 1114 (quoting *Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir.), *cert. denied*, 528 U.S. 106 (1999)); *see Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 684 (8th Cir. 2003); *Deane v. Pocono Medical Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998); *Siederbaum v. City of New York*, 309 F. Supp. 2d 618, 623 (S.D.N.Y. 2004), *aff'd*, 121 Fed. Appx. 435 (2d Cir. 2005); *Wilson v. Int'l Bhd. of Teamsters, Chauffeurs and Warehousemen*, 47 F. Supp. 2d 8, 10 (D.D.C. 1999).

If plaintiff succeeds in establishing a *prima facie* case, the burden shifts to defendant to articulate some legitimate, non-discriminatory reason for the adverse action against plaintiff, and to produce credible evidence supporting its claim. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "[a]lthough the *McDonnell Douglas* framework shifts 'intermediate evidentiary burdens' between the parties, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir.) (citations omitted), *cert. denied*, 540 U.S. 881 (2003); *see also Burdine*, 450 U.S. at 253.

If defendant is successful, then "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal

citations and quotation marks omitted).  At that point, plaintiff has the burden of persuasion to

show that defendant's proffered reason was not the true reason for the employment decision.

*Burdine*, 450 U.S. at 256.  Pretext may be established "directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence."  *Id.* at 256; *see also Reeves*, 530 U.S.

at 143.  "Proof that the defendant's explanation is unworthy of credence is simply one form of

circumstantial evidence that is probative of intentional discrimination, and it can be quite

persuasive."  *Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 517 ("[P]roving

the employer's reason false becomes part of (and often considerably assists) the greater enterprise

of proving that the real reason was intentional discrimination."); *see also Aka v. Washington*

*Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an

employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie

case, combined with sufficient evidence to find that the employer's justification is false, may

permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves*, 530

U.S. at 148.  "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima

facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's

explanation is pretextual.'"  *Id.* at 143 (quoting *Burdine*, 450 U.S. at 255 n.10).

     At this stage, "to survive summary judgment the plaintiff must show that a reasonable

jury could conclude from all of the evidence that the adverse employment decision was made for

a discriminatory reason."  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *see also Aka*,

156 F.3d at 1290.  The D.C. Circuit recently defined "all of the evidence" as "any combination of

(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (citing *Aka*, 156 F.3d at 1289).

## II.   FACTUAL BACKGROUND

### A.  Plaintiff's Application

In May 2002, DCPS was undergoing a "transformation," during which positions were abolished, position descriptions were rewritten, and vacancies were advertised within DCPS and to the general public.  Def.'s Mot., Ex. A (Keyes Dep.) 44:7-15, 45:2-4.  According to DCPS, it was not often that it could "bring in new people.  [It] had almost a closed operation." *Id.* (Keyes Dep.) 41:6-7.  This transformation gave DCPS an opportunity to "find people much more talented than the ones [it had]." *Id.* (Keyes Dep.) 45:5-7.  Incumbents were required to reapply for their positions. *Id.* (Keyes Dep.) 44:17-18.  If the positions were not filled in a timely manner, DCPS could have lost its opportunity to retain those positions, and "[n]o one . . . wanted to give up a position." *Id.* (Keyes Dep.) 243:11-12.

DCPS' Office of Information Technology announced multiple vacancies for the position of Information Technology Specialist (Applications Software), EG-2210-11, which were Level 11 positions.  Pl.'s Opp'n, App. B, Ex. 4 (May 3, 2002 Announcement Number 02-COO-024).  A qualified applicant for the Level 11 Information Technology Specialist ("IT Specialist") position would have:

A.     Undergraduate or Graduation [sic] education major in one of
the following fields of study: computer science, information
science, information systems management, mathematics,
statistics, operations research, or engineering, or course work
that required the development or adaptation of computer
programs and systems and provided knowledge equivalent to
a major in the computer field.
OR
B.     Experience that demonstrated knowledge of computer project
assignments that required a range of knowledge of computer
requirements and techniques.

*Id.*, App. B., Ex. 4 at 1-2.  In addition, each applicant addressed in writing the following ranking

factors:

1.     Knowledge of applications software development concepts
and techniques sufficient to provide technical guidance in
designing, coding, testing, debugging, and maintaining
programs.
2.     Knowledge of methods for integrating and optimizing
components in order to translate and interpret functional
requirements.
3.     Knowledge of database management features sufficient for
testing, installing, implementing, documenting, and
maintaining student and school application software.
4.     Ability to communicate technical knowledge to non-technical
employees.

*Id.*, App. B., Ex. 4 at 2 (emphasis added).  The vacancy announcement was drafted in general

terms so as to attract a broad selection of applicants:

Q:     [Counsel]  So you'd say that the vacancy announcement is a
fair description of what you were looking for in an IT
specialist level 11 person?
[objection omitted]
A:     [Ulysses Keyes]  This vacancy announcement identifies the
basic responsibilities and duties for a person – an EG 11 IT
specialist.
Q:     Are there additional duties and responsibilities beyond the
base ones in that position?

> A:     Well, I would have to go over it, but this is generic to some degree, but it's the way we wanted it, to keep it as open as possible so that we didn't exclude people who didn't feel as though they had that perfect match.  We wanted them to also apply because maybe even though they didn't have that one, that specific area, they may have something that we could substitute for.  So that's why this is – it's kind of general.  It's kind of – it's general, but that's – that's the we way we – it was chosen to be done so that you could – you could cast the widest net.  You could get the most applicants rather than – rather than exclude people, you want to include people who wanted to apply, and so that's why it was like this.

Def.'s Mot., Ex. A (Keyes Dep.) 208:6-209:12.  DCPS also announced vacancies for IT Specialists at the next grade level, Level 12.  *Id.* (Keyes Dep.) 49:20-50:10.  There were seven vacancies at Level 11, and five vacancies at Level 12.  *Id.* (Keyes Dep.) 50:6-10.

Plaintiff, who is deaf, applied for a Level 11 IT Specialist position, submitting his resume and a written statement addressing the ranking factors set forth in the vacancy announcement.[2] Pl.'s Opp'n, App. B, Ex. 1 (Pl.'s Decl.) ¶¶ 3, 5; Def.'s Mot., Ex. D (plaintiff's cover letter, resume, and ranking factors).  Neither plaintiff's resume nor other papers submitted with his application expressly stated that he is deaf.  Def.'s Mot., Ex. D (Pl.'s Dep.) 84:13-16.

### B.  Plaintiff's Interview

An applicant's performance at an interview was important, but was not the only factor DCPS considered.  On this point, Mr. Keyes stated:

> [If] [t]hey did well on the interview, and when you add that, as I said, that's one of the things that you always consider.  You don't just ignore that.

---

[2]     Plaintiff also applied for a Level 12 position, but he was not asked to interview for it.  Def.'s Mot., Ex. D (Pl.'s Dep.) 96:16-20.  He did not challenge DCPS' decision with respect to the Level 12 position.  *Id.* (Pl.'s Dep.) 96:21-97:9.

9

> That's not the only thing you always look at, but when you add that
> with what they had been able to do and what their background was,
> and if they had – if they happened to be doing what it was we were
> doing, that's just the way life is sometimes.

Def.'s Mot., Ex. A (Keyes Dep.) 56:12-21.  An interview provided "a chance to talk to the person beyond just his or her resume and to get a sense of like – of their experience, get a sense of their abilities, just to get an overall reading of the person and to be able to do some type of comparative analysis."  *Id.* (Keyes Dep.) 58:4-9.

Two DCPS employees, Mr. Manuel Farfan and Mr. Henry Thompson, were designated to interview plaintiff.  *See* Pl.'s Opp'n, App. B, Ex. 5 (Panel Interview Rating Sheets).  On July 26, 2002, shortly before the interview began, Mr. Farfan and Mr. Thompson learned that plaintiff is deaf. Def.'s Mot., Ex. B (Farfan Dep.) 35:9-11, 127:9-16 & Ex. E (Thompson Dep.) 73:13-74:5. Although Mr. Ulysses Keyes, too, became aware of plaintiff's disability on the day of the interview, he neither met plaintiff on that day nor participated in the interview itself.  Def.'s Mot., Ex. A (Keyes Dep.) 154:6-156:5.

Mr. Keyes, Mr. Thompson and Mr. Farfan had a conversation among themselves during which they discussed sign language generally:

> Q:      [Counsel]  You say you remember Henry [Thompson] talking
>            about sign language.  What did he say?
> A:      [Farfan]  If we – if anybody knew sign language, because we
>            just knew that he was there and –
> Q:      Did – did Henry Thompson say anything else?
> A:      No.
> Q:      So he asked if anyone knew sign language.  Did anyone
>            respond to that?
> A:      I told him that I always wanted to learn, and I think he told me
>            that he knew or he wanted to learn, too, but –
> Q:      Did anyone else say anything at that time?
> A:      No.

Def.'s Reply (Farfan Dep.) 50:5-19.  It is not entirely clear whether this conversation took place

before or after plaintiff's interview.  Plaintiff's disability did not stop the parties from proceeding

with the interview:

> Q:  [Counsel]  Okay.  When you learned that there was a
> candidate who was deaf for the position, did you have any
> concerns about his deafness?
>
> A:  [Keyes] No.  I had concerns with how I was going to
> interview him, how I was going to get him interviewed, and
> we just wanted to find out the best way to do that.  I didn't
> have any concern about it.  We just had to adapt or do
> whatever we had to do.

Def.'s Mot., Ex. A (Keyes Dep.) 156:6-15.

At some point during the interview, Mr. Thompson passed a handwritten note to plaintiff

asking, "How do you communicate in offices where no one can sign?"  Pl.'s Opp'n, App. A

(Thompson Dep.) 92:12-13.  Plaintiff responded that "the way we can communicate – like

writings – I have no problem with writing as my basic communication."  *Id.*, App. B, Ex. 5

(Thompson interview notes).  Mr. Thompson asked this question expressly "because [plaintiff]

was hearing-impaired."  Pl.'s Opp'n, App. A (Thompson Dep.) 93:3.  He did not ask this

question of any other applicant "because all of the other persons could hear and could speak and

had no difficulty with communications."  *Id.* (Thompson Dep.) 99:7-9.  Mr. Thompson

explained,

> [T]here is a very large dependence on communications.  We have to
> communicate with each other.  We were getting ready to implement
> new educational systems and new business systems.  And there was
> a lot of training going on.  And the person had to be able to get the
> training, understand the training in an environment where there
> probably would not have been a person who was signing.  We
> communicate with users, with other persons within D.C. schools on

> a daily basis, all the way from assistant superintendents to data-entry
> clerks, and we have to able to communicate with them freely, because
> we assist people.

*Id.* (Thomson Dep.) 93:4-18.  Commenting on plaintiff's response to his question, Mr.

Thompson remarked,

> I thought that technically . . . [plaintiff] had all the requirements we
> were looking for, but in our particular shop, I didn't know whether
> that would be sufficient, considering his handicap without some type
> of accommodation.  And I didn't know whether or not D.C. schools
> could provide that type of accommodation to make it work for our
> shop.

*Id.* (Thomson Dep.) 95:5-13.

There was no sign language interpreter present at plaintiff's interview.  Instead, Mr.

Keyes typed the five pre-selected questions posed to all interviewees into a computer, plaintiff

typed his responses to the questions, and Mr. Farfan printed the responses.  Pl.'s Opp'n, App. A

(Thompson Dep.) 72:6-13 & (Farfan Dep.) 49:14-15; Def.'s Mot., Ex. B (Farfan Dep.) 35:13-15

& Ex. D (Pl.'s Dep.), Dep. Ex. 8 (02-COO-024 EG 11 Software Applications Questions and

plaintiff's responses); Def.'s Reply, Ex. A (Keyes Dep.) 157:12-20.  The interviewers rated each

of plaintiff's responses on a scale of 1 to 4 points; plaintiff achieved a combined score of 30

points.  *See* Def.'s Mot., Ex. A (Keyes Dep.) 246:7 & Ex. D (Pl.'s Dep.), Dep. Ex. 8 (Panel

Interview Rating Sheets prepared by Mr. Thompson and Mr. Farfan).

According to plaintiff, of the scores awarded to the applicants for the Level 11 IT

Specialist position, his combined interview score ranked fourth highest.[3]  *See* Def.'s Mot., Ex. D

---

[3]     The names of 20 applicants are listed on the Interview Results forms.  Pl.'s
Opp'n, App. B., Ex. 7.  Three of those applicants received "no score" for reasons not explained
in this record.

12

(Pl.'s Dep.), Dep. Ex. 1 (EEO Charge of Discrimination).  Plaintiff evidently reached this conclusion after having communicated with Marl Green, an employee in DCPS' Human Resources office, whose handwritten notation beside Vacancy Announcement COO-024 read, "4/20."  Pl.'s Opp'n, App. B, Ex. 8 (Marl Green's handwritten notes).  DCPS countered that plaintiff was listed in sixth place, not fourth place, apparently because his name happens to appear sixth on a list of applicants and their respective interview scores.  Def.'s Mot. at 20 & Ex. A (Keyes Dep.), Dep. Ex. 3 (Interview Results).  Review of the record shows that the applicants' names were not listed in descending order according to their combined interview scores.  *See* Pl.'s Opp'n, App. B, Ex. 7 (Interview Results).

The top interview scores were awarded to four incumbents as follows: Fernando Gallup (38 points); Ms. Gaskins-Harrison (37 points), Alvin Brandon (34 points), and Valeria Battle (32 points).  *See* Pl.'s Opp'n, App. B, Ex. 7 (Interview Results).  Both plaintiff and a fifth incumbent, Robert Conway, were awarded the same score (30 points).  *Id.*

The interview score was one but not the only factor in determining whether to extend a job offer.  Pl.'s Opp'n, App. A (Keyes Dep.) 36:14-22; Def.'s Mot., Ex. A (Keyes Dep.) 247:17-18.  DCPS took into account "all the factors that you have, the interview, the resume, the score, the ranking factors, and how it all ties together."  Pl.'s Opp'n, App. A (Keyes Dep.) 72:18-21.  According to Mr. Farfan, the interview score was "probably 50 percent of – of the whole value of the interview of – of getting the job."  Def.'s Mot., Ex. B (Farfan Dep.) 124:16-18.  However, the interview scores are "not like [] a test saying, if you score 10, you get hired, and 9, you don't, or if you have a 10, 9, 8, you have to hire the 9 over the 8."  *Id.*, Ex. A (Keyes Dep.) 59:11-14.  According to Mr. Keyes, small differences in interview scores were not significant:

> Q:      [Counsel]  Okay.  Now, what in your mind is the
>         significance of a score of 30 and a score of 29, if any?
> A:      [Keyes]  The significance to me is that out of the interview
>         process, 30, 39, 31, that's a wash, that they – you know.
> Q:      I don't know what that means.
> A:      I'm sorry.  That they were basically from – from the
>         interviewers' point of view, they did equally well.
> Q:      Does the fact that [plaintiff] got a 30 mandate that he be hired –
> A:      No.
> Q:      – under – let me finish the question.
>         – mandate that he be hired over somebody who scored less than
>         30?
> A:      No.

*Id.*, Ex. A (Keyes Dep.) 246:11-21.  DCPS was not obligated to offer positions to the applicants

with the highest interview scores:

> Q:      [Counsel]  So just to be clear: You don't have to hire the
>         candidates with the highest scores?
> A:      [Keyes]  Absolutely not.

*Id.*, Ex. A (Keyes Dep.) 59:19-21.

The interviewers asked the applicants the same questions, and had an opportunity to ask

follow-up questions.  Pl.'s Opp'n, App. A (Keyes Dep.) 36:2-8.  Among the handwritten follow-

up questions were Mr. Farfan's inquiries as to plaintiff's specific skills:

> Q:      [Counsel]  Could you please read for me what on that page is
>         your handwriting?
> A:      [Farfan]  Sure.  "Have you used a lot of VBScript and ASP?"
>         And then, "Any JavaScript for client server functions?"
> Q:      And do you recognize the other handwriting on the page?
> A:      Yes.  That's [plaintiff's] handwriting.
> Q:      And these questions that you've just read that were in your
>         handwriting, what were those?
> A:      What do you mean, "what were those?"
> Q:      Well, let me –
> A:      Web-based type of questions?
> Q:      Let me ask that in a different way.  When did you write those
>         questions?

A:      Probably at the end of the interview.

Q:      And why?

A:      Because I probably read the answers he wrote.

Q:      And why did you ask him if he had used a lot of VBScript and ASP?

A:      Because of his answer probably to the last question, I was just curious about that experience – that particular experience.

Q:      And what did you think about his answer?

A:      For Number 5?  That's Number 5?[4]

Q:      Yes, first for Number 5, and then his response to the handwritten question you asked after.

A:      Oh.

Q:      But first, what did you think about his answer to Number 5?

A:      That he – his answer to Number 5 really reflected that he was using Web technology, that he was learning that.  And when he wrote his answer, he didn't specify VBScript there, so I asked him that, if he had used a lot of VBScript and ASP, and he said, yes, very much.

Q:      And does – in 2002, was DCPS using VBScript and ASP?

A:      Yes, we – it was just me and Mr. Keyes.

Q:      And the second handwritten question that you asked, could you read that again, please?

A:      Sure.  "Any JavaScript  for client server functions?"

Q:      And why did you ask him that question?

A:      Because it's just our technology.  I mean, VBScript and ASP are Web-based server side coding, and JavaScript is more client server side coding and we used that at that time.

Q:      And what was [plaintiff's] response?

---

[4]      References to the "last question" and "Number 5" apparently are references to the fifth pre-selected question posed to all applicants, asking the applicant to "share [his] most recent, personal IT skills upgrade."  Def.'s Mot., Ex. D (Pl.'s Dep.), Dep. Ex. 8 (Panel Interview Rating Sheet).  Plaintiff's verbatim typewritten response to this question was:

> Visual Basic.net, MS frontPage 2002 and Javascript and recently I am working about to develop Internet applications that let you read your own server email and others at one time rather than for you to read several email browser.  I also developed African game over Internet called "stones in bowl" I just keep practicing to keep my skills upgraded all times.  I hope I answered your questions correctly.

*Id.* (02-COO-024 EG 11 Software Applications Questions).

> A:     "I only used ADO.NET (use ASP.NET) recently, but ODBC
>        DSN-Less.  I used ASP a lot for client server functions,"
>        which – his answer was wrong, it has nothing to do with
>        JavaScript.  I mean, he was talking about oranges, and I was
>        asking about apples, basically.
>
> Q:     Did you ask him again about the JavaScript?
>
> A:     No, because with that answer I knew that he didn't know what
>        I was asking him.

Def.'s Reply (Farfan Dep.) 53:3-55:22.

After plaintiff left, Mr. Keyes, Mr. Farfan and Mr. Thompson discussed how DCPS might

accommodate plaintiff if he were hired:

> Q:     [Counsel]  Okay.  I'd like to ask you a little bit more about
>        what happened after [plaintiff] left.  You said that – that you
>        and Mr. Thompson and Mr. Keyes were in a room together
>        and that Mr. Thompson talked about sign language.  Was
>        there any more conversation at that time about [plaintiff]?
>
> A:     [Farfan]  Yes, – when he left, Mr. Keyes – I asked Mr. Keyes
>        if we – if we hired him, how would we accommodate him to,
>        you know – so that he will work fine, just wondering how we
>        would – I mean, nothing bad, but just how would we
>        accommodate him in case we hired him.  And Mr. Keyes
>        looked at me like, yeah, saying we will think about it if – if
>        the moment comes.
>
> Q:     You just said that he looked at you like – I just want to be
>        clear on what Mr. Keyes said.
>
> A:     It was a good look – it was just, oh, yeah, we will think about
>        it when it comes.  It was not, oh, yeah, that's a big problem,
>        no; it was something normal.
>
> Q:     Did he say anything at that time?
>
> A:     He – no, he was just like, yeah, we will figure it out when that
>        moment comes.
>
> Q:     And I just want to be clear I understand.  Was that what you
>        saw in his look or did he actually say something like that?
>
> A:     No, it was both.
>
> Q:     Okay.  So Mr. Keyes said something to the effect of we'll
>        think about it if and when the time comes; is that correct?
>
> A:     Yes, and we can always accommodate him, something like
>        that.

Def.'s Reply (Farfan Dep.) 57:10-58:21.

*C.  Selection of the Five Incumbents*

Mr. Keyes determined the applicants to whom DCPS should extend job offers, and made these recommendations to Mr. Thompson.  Def.'s Mot., Ex. A (Keyes Dep.) 40:11-12; Pl.'s Opp'n, App. A (Keyes Dep.) 52:9-20.  Mr. Thompson made the actual job offers and handled any associated paperwork.  Pl.'s Opp'n, App. A (Keyes Dep.) 52:20-22.  Staff of the Human Resources office were responsible for "notify[ing] those people that they had been hired."  Def.'s Mot., Ex. A (Keyes Dep.) 82:19-22.  Mr. Keyes was not "supposed to talk to anyone after the interview," and for this reason "never called anyone back to tell them, no or to tell them yes."  *Id.* (Keyes Dep.) 82:22-83:1, 83:6-7.

On July 30, 2002, DCPS offered positions to the five incumbents who had applied and interviewed for their Level 11 positions.  *See* Def.'s Mot., Ex. A (Keyes Dep.) 161:8-21; Pl.'s Opp'n, App. A (Keyes Dep.) 51:4-16 & App. B, Ex. 6 (Answers to Plaintiff's First Set of Interrogatories, Interrogatory No. 14).  Mr. Keyes explained these hiring decisions as follows:

> Q:     [Counsel]  How did you decide to recommend that these 5 people be hired for the level 11 position?
> A:     [Keyes]  Well, these were people – aside from the fact that they were already experienced in the operation, they were doing their jobs, they had applied, they had competed, and they had scored within the range necessary that when you added that to their experience, it really made it a very good choice.  We were about to open up schools again.  You had to have people who knew what was going on in the school system.   And they had that experience.   They had that background.  And they were good, talented people who could do the job.
> Q:     Were there any other reasons you decided to offer the position to those 5 people?

> A:       Aside from their qualifications, experience, and backgrounds,
>            that was the primary reason.

Def.'s Mot., Ex. A (Keyes Dep.) 55:9-56:6.  Furthermore, the incumbents "had a very big

advantage coming back on board, because like this is July and August, and schools open . . . in

September."  *Id.* (Keyes Dep.) 239:6-9.  "[I]t would be hard to bring on 7 new people in August

and open schools and not be on the front page of the Washington Post."  *Id.* (Keyes Dep.) 239:9-

11.

### D.  Selection of Mr. Iqbal and Ms. Wang

At this point, in August 2002, two Level 11 positions remained vacant.  With these

positions, DCPS could "go out and try hard to get the kind of, you know, star or get someone

who is going to take us to the next level."  Def.'s Mot., Ex. A (Keyes Dep.) 239:16-19.  In filling

these two positions, DCPS was:

> [R]eally looking for someone to come in and be  – not someone – not
> just to come in and carry the work.  We have the – can we find
> someone who is really going to do what we want to have done, almost
> be like a star.  You're looking for that person who can really turn your
> operation around or be specifically tied to what it is you're trying to
> do, be it a project they're working on and you have limited skills
> based on if you find that someone that kind of had that area, things
> like that.

*Id.* (Keyes Dep.) 41:10-20.  In an effort to "raise the bar," *id.* (Keyes Dep.) 74:21, rather than

selecting among the remaining Level 11 interviewees, DCPS chose to announce the vacancies

again.  *Id.* (Keyes Dep.) 74:13-75:4; *see* Pl.'s Opp'n, App. B, Ex. 12 (August 12, 2002 Vacancy

Announcement Number 02-COO-024).  Mr. Keyes explained his decision to readvertise the

Level 11 positions as follows:

> Q:    [Counsel]  So just to be clear, why was the level 11 position
>       readvertised in August of 2002?
> A:    [Keyes]  Because none of the people we saw who we didn't
>       hire the first time around were people who we thought were
>       the best that we could do at that time.

Def.'s Mot., Ex. A (Keyes Dep.) 75:19-76:2.  This second announcement generated only one

qualified applicant, who was interviewed but was not offered a position.  *Id.* (Keyes Dep.) 75:9-

18, 77:1-2.  Having had no success in attracting additional qualified applicants, DCPS

"revisit[ed] some of these, some of the people who [DCPS] had said no to at first," Def.'s Reply

(Keyes Dep.) 143:9-11, but, facing time pressure at the end of the transformation period, DCPS

"ha[d] to do this or else [it was] going to lose these positions altogether."  *Id.* (Keyes Dep.)

143:12-14.

     Mr. Keyes, who had been among those who interviewed applicants for the Level 12

positions, Def.'s Mot., Ex. A (Keyes Dep.) 107:22-108:1,  recalled applicants who "were [not]

ready to be 12s, mostly because they didn't have the supervisory experience, but [thought] they

may be decent candidates" for the Level 11 positions.  *Id.* (Keyes Dep.) 78:3-6.  An applicant

qualified for the higher position, Level 12, was automatically qualified for the lower position,

Level 11, and the fact that an applicant did not apply for a Level 11 position did not bar DCPS

from offering him or her a Level 11 position.  *Id.* (Keyes Dep.) 78:14-17, 108:3-14.  Mr. Keyes

did not "go back and revisit all of the 11s over again."  *Id.* (Keyes Dep.) 115:15-16.

### 1. Mr. Iqbal

     Mr. Iqbal had applied for both the Level 11 and the Level 12 IT Specialist positions.  *See*

Pl.'s Opp'n, App. B, Ex. 9-10 (Iqbal's Interview Scores for Level 11 and Level 12 positions,

respectively).  Although Mr. Iqbal was not offered a Level 11 position after his July 27, 2002

interview, Mr. Keyes offered Mr. Iqbal the Level 11 position in October 2002 based solely on his

application for the Level 12 position. *Id.*, App. A (Keyes Dep.) 115:22-116:16, 129:17-130:6;

Def.'s Mot., Ex. C (Iqbal Decl.) ¶ 3. "At the time [Mr. Keyes] made the offer to Mr. Iqbal, he

was more qualified – better match for us than anybody else in the untapped pool, including

[plaintiff]." Def.'s Mot., Ex. A (Keyes Dep.) 217:3-6.

Having reviewed Mr. Iqbal's resume and responses to the Ranking Factors, Mr. Keyes

found that Mr. Iqbal had "specific corporate experience or enterprise experience involved in

financial systems, [and was] involved in user training in a diverse environment, things like that."

Def.'s Mot., Ex. A  (Keyes Dep.) 217:19-218:1.  For Mr. Keyes, Mr. Iqbal's corporate experience

"was really what it came down to." *Id.* (Keyes Dep.) 218:3-4.  Mr. Farfan noted that Mr. Iqbal

"had a lot of mainframe experience." *Id.*, Ex. A (Keyes Dep.), Dep. Ex. 2 (Farfan's interview

notes), Ex. B (Farfan Dep.) 62:3-4 & Ex. C (Iqbal Decl.) ¶¶ 5-6.  In fact, Mr. Iqbal was asked

questions during his interview about his "experience working with large mainframe computer

systems," and he discussed his "resume and experience with large enterprise-wide mainframe

computer systems" in previous positions with Ogden/ERC Government Systems, U.S. Railroad

Passenger Corp., and Viatech Systems, Inc. *Id.*, Ex. C (Iqbal Decl.) ¶¶ 5-6.  Although mainframe

experience was not a skill DCPS specifically sought or mentioned in the vacancy announcement,

it "was a preferred thing to have," *Id.*, Ex. B (Farfan Dep.) 128:11, because a Level 11 IT

Specialist would "probably have to do [] mainframe work on a daily basis." *Id.* (Farfan Dep.)

128:15-16.  Further, a person with mainframe experience is a person who necessarily "has been

exposed to the corporate world, to the enterprise world." Def.'s Reply (Keyes Dep.) 146:8-9.

That person would have been "in a corporate environment working with corporate people and all

the things that go along with that, working with users, customers, [and]  supervisors."  *Id.* (Keyes

Dep.) 146:19-22.

### 2.  Ms. Wang

Ms. Wang applied for the Level 12 IT Specialist position only.  Def.'s Mot., Ex. F (Wang

Decl.) ¶ 4.  Mr. Keyes noted a gap in her experience "because she had left work for a period of

time to raise a family, to start a family."  Pl.'s Opp'n, App. A (Keyes Dep.) 131:18-20.  In

addition, Mr. Keyes commented that, "although she had worked very much in the corporate

world, she hadn't been there . . . in a few years," surmising that she would need time "to get back

up to speed perhaps."  *Id.* (Keyes Dep.) 133:9-13.  For this reason, and for her lack of

"documented leadership experience," *id.* (Keyes Dep.) 133:7,  Mr. Keyes did not offer Ms. Wang

the Level 12 position.  *Id.* (Keyes Dep.) 20-22.

Notwithstanding these drawbacks, Mr. Keyes chose Ms. Wang "because she had

documented experience in an application[, PeopleSoft,] which we felt very attractive."  Def.'s

Mot., Ex. A (Keyes Dep.) 138:17-19.  He commented that Ms. Wang "went through . . . pretty

decent lengths to point out . . . that even though she had been home, she was still in school, she

was still keeping her skills up."  Pl.'s Opp'n, App. A (Keyes Dep.) 132:12-15.  DCPS offered

Ms. Wang a Level 11 IT Specialist position as she was deemed a better match for DCPS' needs:

> Q:    [Counsel]  Why was Cynthia Wang better qualified or to use
>        the language you were using before, a better match for the
>        level 11 position than any of the other candidates?
> A:    [Keyes]  Ms. Wang had certain specific skills that although
>        we did not place them in the advertisement, PeopleSoft being
>        an example of what I'm giving here now, that were right on
>        time with what we were doing at that time.  We were in the
>        middle of a PeopleSoft implementation, and we were in the
>        process of hiring consultants and trying to get staff up to

> speed with someone who understood the HR portion of that
> and the financial, but the RH [sic] portion was what she had
> experience in.  She had done most of – she had done most of
> the levels of the systems implementation using that product,
> using an earlier version of that product.

Def.'s Mot., Ex. A (Keyes Dep.) 225:17-226:13.

### E.  Plaintiff's Visits to Mr. Keyes

Plaintiff visited Mr. Keyes on two occasions.  On August 2, 2002, plaintiff went to Mr.

Keyes' office and passed Mr. Keyes a handwritten note asking, in effect, when he would start

working.  Def.'s Mot., Ex. A (Keyes Dep.) 163:18-164:2.  According to plaintiff, Mr. Keyes told

him that he would be notified about the job by October 1, 2002.  Pl.'s Opp'n, App. A (Pl.'s Dep.)

76:1-2.  Plaintiff heard nothing by that date, and visited Mr. Keyes again on October 4, 2002.  *Id.*

(Pl.'s Dep.) 76:3-4.  "Mr. Thompson also happened to be coming by . . ., so [plaintiff] waived to

him and he came over to join [plaintiff and Mr. Keyes]."  *Id.* (Pl.'s Dep.) 77:5-8.  While Mr.

Keyes left to talk to a secretary, plaintiff asked Mr. Thompson "if [his] disability was going to

affect the hiring decision," and Mr. Thompson responded, "no, it would not be a factor."  *Id.*

(Pl.'s Dep.) 78:6-9.  According to plaintiff, Mr. Keyes was to have notified him by October 18,

2002 on the status of his application.  *Id.* (Pl.'s Dep.) 76:6-7.

### F.  Plaintiff's EEO Charge

After plaintiff learned that all the Level 11 IT Specialist positions had been offered to

other applicants, he filed a charge of discrimination against DCPS with the Equal Employment

Opportunity Commission ("EEOC").  Def.'s Mot., Ex. D (Pl.'s Dep.), Dep. Ex. 1 (December 30,

2002 Charge of Discrimination).  Plaintiff's EEO charge read as follows:

22

On May 31, 2002, I applied for the position of Information Technology Specialist (Application Software) with [DCPS]. In July 2002, <u>I was interviewed by two individuals who were aware of my disability before the interview</u>. On August 2, 2002, I called Human Resources to check on my interview status and learned that I was ranked fourth out of 20 applicants. <u>I was informed by Mr. Marl Green in Human Resources that there were five vacancies for the position</u>. On this same day, I met with Mr. Ulysses Keyes to find out why I had not been offered the position. <u>I also made Mr. Keyes aware of my disability on this day</u>. I was told by Mr. Keyes that the decision would be made on October 1, 2002 because Human Resources has continual candidate interviews for other positions. On October 1, 2002, I met with Mr. Keyes again then he told me the decision will be made on October 18, 2002. I have tried to get in contact with Mr. Keyes since October 18, 2002, but without success. On December 1, 2002, <u>I learned that all five positions were filled</u>.

*Id.* (emphasis added). Absent from plaintiff's EEOC charge is a claim that DCPS failed to accommodate him by providing a sign language interpreter for his interview. According to the evidence before the EEOC, "it [did] not appear that [plaintiff] was discriminated against in any way because of [his] disability." *Id.* (Pl.'s Dep.), Dep. Ex. 3 (letter from T. Ngo, EEOC Investigator).

### III.   PLAINTIFF'S *PRIMA FACIE* CASE

#### A.  Plaintiff Has a Disability

Generally, under the ADA:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The term "disability" means:

(A)   a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

23

  (B)  a record of such an impairment; or

  (C)  being regarded as having such an impairment.

42 U.S.C. § 12102(2).

  Plaintiff is permanently deaf.  Pl.'s Opp'n, App. B, Ex. 1 (Pl.'s Decl.) ¶ 1.  Hearing is

considered a major life activity, *see* 29 C.F.R. § 1630.2(*i*), and its permanent loss fits the

definition of "disability" under the ADA.  *See* 42 U.S.C. § 12102(2)(a).  For purposes of this

motion, DCPS "does not challenge plaintiff's claim that he has a disability that affects a major

life activity as required by the ADA."  Def.'s Mot. at 15 n.2.

  *B.  Plaintiff was Qualified for the Level 11 IT Specialist Position*

  Under the ADA, the term "qualified individual with a disability" means:

> an individual with a disability who, with or without reasonable
> accommodation, can perform the essential functions of the
> employment position that such individual holds or desires.

42 U.S.C. § 12111(8).  The parties do not dispute that plaintiff was qualified for the Level 11 IT

Specialist position.  *See* Def.'s Mot., Ex. A (Keyes Dep.) 209:20-210:10 & Ex. E (Thompson

Dep.) 74:13-17; Pl.'s Opp'n (Thompson Dep.) 75:15-19, 95:5-6.  Thus, plaintiff establishes that

he is a qualified person with a disability under the ADA, and makes out the first and second

elements of his *prima facie* case.

  *C.  Plaintiff Did Not Suffer an Adverse Employment Action Because of His Disability*

  The parties do not dispute that plaintiff suffered an adverse employment action, in that

DCPS did not offer him a Level 11 IT Specialist position for which he applied and was qualified.

Neither party addresses in more than a cursory statement whether, for purposes of making out his

*prima facie* case of discrimination, plaintiff establishes by a preponderance of the evidence that DCPS took this adverse action because of his disability.

DCPS asserts that, "other than establish that he is deaf, plaintiff has failed to present any evidence that he was not selected for the IT specialist position because of his disability." Def.'s Mot. at 15. In support of its assertion, DCPS merely notes that "9 other non-deaf applicants [] were not selected from the [Level 11] pool," and that Mr. Keyes "articulated the basis for his hiring decisions." *Id.* After discussing the reasons for offering the remaining Level 11 positions to Ms. Wang and Mr. Iqbal, DCPS promptly moves on to address plaintiff's failure to meet his burden "to prove that the legitimate reasons articulated by Mr. Keyes for hiring the seven (7) persons were pretextual." *Id.* at 16.

Plaintiff does not dwell on this element of the *prima facie* case either. He refers to his interview score in relation to that awarded to one incumbent, Mr. Conway, and to Mr. Iqbal, Pl.'s Opp'n at 10, and emphasizes the timing of events: only after DCPS became aware of his disability did it fail to "seriously consider [him] for the [Level 11] position although there was no doubt about his qualifications and ability to perform the essential functions of the job," deciding instead to readvertise the position, and, ultimately, to choose among "applicants who DCPS had previously rejected for this and another position." *Id.* Next, responding to DCPS' arguments, plaintiff proceeds to argue that the reasons advanced for the hiring decisions were pretextual. *Id.* at 10-11.

Review of the record reveals only two pieces of evidence relevant to the issue of whether DCPS declined to offer plaintiff a position due to disability discrimination. First, Mr. Keyes, Mr. Farfan and Mr. Thomas discussed sign language generally, and after the interview discussed how

DCPS might accommodate plaintiff if he were hired.  *See* Def.'s Reply (Farfan Dep.) 50:5-19, 57:10-58:21.  Second, by passing a handwritten note to plaintiff, Mr. Thompson asked plaintiff how he communicates in a situation where no one else uses sign language.  *See* Pl.'s Opp'n, App. B, Ex. 5 (Thompson interview notes).  Plaintiff responded, also in a handwritten note, that he had "no problem with writing as [his] basic communication."  *Id*.  Neither of these incidents shows discrimination based on plaintiff's disability.  No negative inference can be drawn from a discussion among interviewers who, faced with the prospect of interviewing or potentially hiring a deaf person, discuss their knowledge of or interest in learning sign language.  Nor do Mr. Farfan's questions to Mr. Keyes about possible accommodations show disability discrimination. Mr. Keyes' responses suggest that the prospect of hiring or accommodating a deaf employee did not raise a concern for him; rather, plaintiff's disability was treated as if it were a matter capable of resolution to be addressed at a later date if plaintiff were offered a position.

Because plaintiff fails to establish by a preponderance of the evidence that DCPS did not hire him because of his disability, the Court concludes that plaintiff fails to make out a *prima facie* case of discrimination based on his disability.  Assuming *arguendo* that plaintiff has met his evidentiary burden, the Court proceeds with its analysis.

### IV.  DCPS' EXPLANATION FOR ITS HIRING DECISIONS

*A.  The Five Incumbents*

DCPS offered a Level 11 IT Specialist position to each of the five incumbents who reapplied for his or her position.  As noted above, DCPS extended these offers on July 30, 2002, within weeks of the beginning of a new school year, based on the incumbents' experience at DCPS as well as their successful completion of the application and interview process.  Plaintiff

raised no specific objection to DCPS' decision to offer Level 11 positions to these incumbents, and the Court need not address this matter further.

### B.  Selection of Mr. Iqbal and Ms. Wang

As discussed above, DCPS filled the remaining Level 11 vacancies by selecting applicants who applied for but were not offered Level 12 positions.  DCPS offered positions to Mr. Iqbal and Ms. Wang, both of whom were deemed not only qualified for the Level 11 IT Specialist position but also a better match for DCPS' needs at that time.  *See* Def.'s Mot., Ex. A (Keyes Dep.) 210:15-16.  DCPS selected Mr. Iqbal based on his several years' experience in corporate environments and his recent experience with mainframe computer systems.  Ms. Wang's previous experience with PeopleSoft applications was of particular interest to DCPS as it was implementing an updated version of that product.

The Court concludes that DCPS meets its burden of production by articulating legitimate, non-discriminatory reasons for its decision not to offer a Level 11 IT Specialist position to plaintiff.

## V.  PRETEXT

At this point, plaintiff "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."  *Lathram*, 336 F.3d at 1088.

### A.  Sign Language Interpreter

Plaintiff evidently relies on the absence of a sign language interpreter at plaintiff's interview as evidence of discrimination.  *See* Pl.'s Opp'n at 12-13.  Without an interpreter, he

argues that he "could not openly and effectively communicate with the interviewers," and, for this reason, "DCPS did not get a true sense of [plaintiff's] experience." *Id.* at 12.

The parties disputed whether DCPS was on notice of plaintiff's hearing disability and whether plaintiff requested a sign language interpreter in advance.  Plaintiff believed that he requested an interpreter, Pl.'s Opp'n, App. A (Pl.'s Dep.) 82:16-19, and, further, assumed that his hearing disability already was known to DCPS.  According to plaintiff, "if someone were to have gone through the resume and had picked up on Gallaudet University, they would have recognized the deafness link."[5]  *Id.* (Pl.'s Dep.) 84:16-19.  Plaintiff further assumed that, because "he called [DCPS] through the Maryland Relay Service . . . the person [he] was talking to had to have known [he] was deaf."[6]  *Id.* (Pl.'s Dep.) 84:19-22.  The interviewers stated that they learned of plaintiff's hearing disability on the day of plaintiff's interview.  Def.'s Mot., Ex. A (Keyes Dep.) 154:12-13, Ex. B (Farfan Dep.) 35:9-21, Ex. E (Thompson Dep.) 73:7-20.  Although staff tried to find a sign language interpreter, no one was able to locate an interpreter for the interview.  *Id.* (Keyes Dep.) 155:1-6, 156:21-22.

Nothing in the record suggests that, on the day of the interview, plaintiff objected to proceeding with the interview without a sign language interpreter present, or that he objected to the procedure devised for conducting the interview, that is, to type the pre-selected interview questions and plaintiff's answers and to pose follow-up questions and answers in the form of

---

[5]     According to plaintiff's resume, he worked under contract at Gallaudet University as a Computer Specialist from 1998 to 2001.  Pl.'s Opp'n, App. B, Ex. 3 (Resume).

[6]     Plaintiff had communicated with DCPS by telephone prior to the interview and made arrangements for the interview with a secretary.  Def.'s Mot., Ex. D (Pl.'s Dep.) 82:16-22, 84:1-7.

handwritten notes.  Furthermore, plaintiff did not raise a "failure to accommodate" claim in the

EEO charge, *see* Def.'s Mot., Ex. D (Pl.'s Dep.), Dep. Ex. 1, 4, and expressly does not assert "a

failure to accommodate claim based on the failure to provide an interpreter" in this action.  Pl.'s

Opp'n at 12 n.4.  DCPS' alleged failure to provide a sign language interpreter for plaintiff's

interview does not support plaintiff's position that it is evidence of discrimination.

Alternatively, plaintiff argues that DCPS could have "rescheduled the interview and

found an interpreter," or could have "used its discretion to conduct a follow-up interview in the

presence of an interpreter."  Pl.'s Opp'n at 13.  Lacking in his opposition is any support for the

proposition that DCPS was obligated to propose these alternatives, and plaintiff points to no

evidence in the record that he requested either of these alternatives.

Lastly, plaintiff argues that, "by having to type his answers initially on the computer and

later by paper and pencil clearly limited the length and breadth of [his] answer[s]."  Pl.'s Opp'n

at 13.  With this argument, plaintiff appears to suggest that the interviewers could not or did not

elicit information pertaining to his work experience, particularly the corporate mainframe

experience that DCPS supposedly sought.  *See id.*

To the contrary, in handwritten follow-up questions, Mr. Farfan asked specific questions

pertaining to plaintiff's experience.  *See* Def.'s Reply (Farfan Dep.) 53:3-55:22.  This exchange

took place using written communication, plaintiff's chosen form of communication in an office

setting where no one else used sign language.  It was through this exchange that Mr. Farfan

construed plaintiff's professional experience principally as "using Web technology," *see id.*

(Farfan Dep.) 54:15-16, not mainframe computer systems.

*B.  Interview Scores*

Plaintiff relies on the interview scores as evidence of discrimination, noting first that he "received an interview score equal to that of a hired applicant, Robert Conway."  Pl.'s Opp'n at 10.  He further argues that he "scored higher than [Mr.] Iqbal who was eventually hired."  *Id.* Plaintiff was awarded a combined score of 30 points, while Mr. Iqbal was awarded a combined score of 29 points.  *See id.*, App. B, Ex. 7 (Interview Scores).

There is no dispute that the interview was an integral part of the application process. However, an applicant's interview score was one, but not the only, factor in deciding whether to extend a job offer.  An applicant's ranking factors and work experience, among other things, were considered.  DCPS was not required to extend job offers to the candidates who achieved the highest interview scores.

There was no great disparity in the interview scores awarded to the successful applicants. Mr. Keyes testified that, from his perspective, applicants with similar interview scores were considered to have performed equally well.  *See* Def.'s Mot., Ex. A (Keyes Dep.) 246:11-21. The incumbents who applied and interviewed for their positions were awarded interview scores greater than or equal to plaintiff's score.  In addition, the incumbents had an obvious advantage over plaintiff: they had a proven record at DCPS given their past experience.  DCPS made its hiring decisions in late July 2002 and, faced with the September beginning of a new school year, the incumbents were already in place and ready to continue.

Based on this undisputed evidence, the weight given to interview scores does not amount to evidence of discrimination based on plaintiff's disability.

### C. Inquiry Regarding Plaintiff's Ability to Communicate
### and Discussion Regarding Sign Language

Plaintiff returns to two exchanges, though not sufficient to support his *prima facie* case of discrimination, to expose DCPS' "concern" about his disability as evidence of pretext: the conversation among Mr. Thompson, Mr. Farfan and Mr. Keyes regarding sign language, and Mr. Thompson's inquiry regarding how plaintiff communicates in an office where no one uses sign language. *See* Pl.'s Opp'n at 14.

Mr. Keyes, Mr. Farfan and Mr. Thompson discussed sign language among themselves, with Mr. Thompson asking the others whether they knew sign language. It is not clear whether this discussion took place before or after plaintiff's interview, but it certainly took place after Mr. Keyes, Mr. Farfan and Mr. Thompson had become aware of plaintiff's disability. DCPS was confronted with the practical difficulties inherent in interviewing a deaf applicant whose ability to communicate verbally was limited. Mr. Thompson's question about sign language in this context was a reasonable one, which, at most, reflects the interviewers' concern about the mechanics of conducting the interview itself. Mr. Farfan and Mr. Thompson both indicated an interest in learning sign language, but such interest could not resolve the issue at hand. Notwithstanding their lack of knowledge of sign language, the interviewers pressed on. In Mr. Keyes's words, he and the interviewers "had to adapt or do whatever we had to do" in order to proceed. Def.'s Mot., Ex. A (Keyes Dep.) 156:14-15. No negative inference can be drawn from the fact that Mr. Thompson, Mr. Keyes and Mr. Farfan discussed the topic of sign language among themselves.

31

Mr. Thompson's inquiry as to how plaintiff communicates in situations where no one else knows sign language also occurred after Mr. Keyes, Mr. Farfan and Mr. Thompson had learned of plaintiff's disability and the apparent limitations in his ability to communicate.  It does not appear that Mr. Keyes was present during this exchange.  DCPS deems the inquiry a legitimate question related to plaintiff's ability to perform job-related functions, Def.'s Mot. at 20, while plaintiff views the same inquiry, "at the pre-employment stage, [as] prohibited behavior under applicable ADA and EEOC guidelines."  Pl.'s Opp'n at 14.

Under the ADA, an employer "shall not . . . make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability."  42 U.S.C. § 12112(d)(2)(A).  However, an employer "may make preemployment inquires into the ability of an applicant to perform job-related functions."  42 U.S.C. § 12112(d)(2)(B); *see* 29 C.F.R. § 1630.01(a).  At the pre-offer stage, although "an employer cannot ask questions that are *likely to elicit* information about a disability," the prospective employer "may ask whether applicants can perform any or all job functions, including whether applicants can perform job functions 'with or without a reasonable accommodation.'"  *ADA Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations*, EEO Notice No. 915.002 (Oct. 10, 1995) at 4 (emphasis in original).

No one disputed plaintiff's technical qualifications for the position.  His technical qualifications were not the sole relevant consideration.  Among other factors, all candidates for the Level 11 IT Specialist position were evaluated on their "[a]bility to communicate technical knowledge to non-technical employees."  Pl.'s Opp'n, App. B, Ex. 4 at 2.  Plaintiff was aware that the position required communication, and this understanding is reflected in his deposition

testimony.  Def.'s Mot., Ex. D (Pl.'s Dep.) 90:18-21.  Given the importance of communication

for a Level 11 IT Specialist, Mr. Thompson's inquiry was geared directly towards plaintiff's

ability to perform a function of that position.  It was reasonable for Mr. Thompson to explore

whether and how effectively plaintiff would function in various DCPS offices where no one else

used sign language.  If Mr. Thompson's inquiry is probative of anything, it suggested serious

consideration of plaintiff's application, and shows that DCPS was looking ahead to envision how

plaintiff might perform in the Level 11 position.  Viewed in context, Mr. Thompson's inquiry,

although made at a pre-employment stage, was entirely appropriate, such that no negative

inference may be drawn from it.

Mr. Keyes is the person who made DCPS' hiring decisions.  Nothing in his deposition

testimony or in any other evidence in this record suggests that he considered plaintiff's disability

a drawback, impediment or obstacle that could not be overcome.  Rather, Mr. Keyes appears to

have been thinking of how to accommodate plaintiff's disability, not only for the purpose of

conducting the interview itself, but also in considering how plaintiff might function in an office

setting if he were hired.  An example of his willingness to accommodate is reflected in Mr.

Farfan's testimony.  According to Mr. Farfan, Mr. Keyes did not treat plaintiff's disability as a

"big problem, no; it was something normal."  Def.'s Reply (Farfan Dep.) 58:8-9.  Rather,

plaintiff's disability merely was a matter to be addressed if and when the time came, as DCPS

"can always accommodate him."  *Id.* (Farfan Dep.) 58:20.  Discussions about sign language or

how DCPS might accommodate plaintiff cannot be construed as evidence of discrimination

against plaintiff because of his disability.

### D.  *"Hiring Around" Plaintiff*

Aside from his argument pertaining to interview scores, plaintiff does not challenge DCPS' decision to offer Level 11 positions to the five incumbents who applied and interviewed for their positions.  However, with respect to filling the remaining two vacancies, plaintiff suggests that DCPS "made a concerted effort to look everywhere and anywhere in order to consider anyone other than [plaintiff] after learning that he was deaf."  Pl.'s Opp'n at 18.

### 1.  Re-advertising the Level 11 Position

Plaintiff notes that DCPS made "absolutely no changes to the vacancy announcement, ranking factors, or standard interview questions," Pl.'s Opp'n at 15, yet filled the last two Level 11 IT Specialist positions with candidates who purportedly had skills and experience that DCPS did not mention.  Plaintiff is correct in noting that the two vacancy announcements are practically identical, and neither lists specific or required skills or experience.  However, Mr. Keyes explains that the vacancy announcement purposely was drafted in broad terms so as to attract the widest possible selection of applicants.  *See* Def.'s Mot., Ex. A (Keyes Dep.) 208:20-209:12.  The announcement does not list, for example, "the 13 skills [the applicants] need to have, or these 8 skills versus those 4 skills."  Pl.'s Opp'n, App. A (Keyes Dep.) 68:15-17.

The record shows that DCPS was taking advantage of a rare opportunity to bring new employees on board, *see* Def.'s Mot., Ex. A (Keyes Dep.) 41:5-7, hoping that the new employees would "turn [the] operation around or be specifically tied to what it is [DCPS was] trying to do." *Id.* (Keyes Dep.) 41:16-18.  Neither DCPS' decision to re-advertise the Level 11 positions nor the announcement's contents indicates a discriminatory motive.

2.  Mr. Iqbal

DCPS not only re-advertised the vacancies, but also offered the positions to an applicant it already had rejected, and to an applicant who had not applied for the Level 11 position.  *See* Pl.'s Opp'n at 16-18.  In plaintiff's view, these facts expose flaws in DCPS' proffered explanation for its hiring decisions.  *See id.* at 16.  With regard to Mr. Iqbal's selection, plaintiff attacks DCPS' claim to have hired him for his mainframe experience.  *Id.*

Relying on Mr. Thompson's testimony, *see* Pl.'s Opp'n, App. A (Thompson Dep.) 83:19-84:17, plaintiff argues that mainframe experience was not necessary for the job.  Pl.'s Opp'n at 16.  Elsewhere in the record, however, there is testimony showing that mainframe experience was important, or at least desirable, as a Level 11 IT Specialist would be expected to work with mainframes daily.  *See* Def.'s Mot., Ex. B (Farfan Dep.) 40:22-41:7.

Mr. Iqbal's resume shows that he had worked as a Senior Programmer/Analyst since 1995, at Viatech Systems, Inc. from June 1995 through November 1999, then at Carefirst BlueCross BlueShield Insurance Company from July 2000 through December 2001.  *See* Def.'s Mot., Ex. F (Iqbal Resume).  In these and previous positions, he had worked with "large enterprise-wide mainframe computer systems."  *Id.* (Iqbal Decl.) ¶ 6.  Plaintiff's resume shows that he had worked for roughly one year as a Systems Analyst with DeRoyal Business Systems and that he had knowledge of several computer languages, including some that run on a mainframe.  *See* Pl.'s Opp'n, App. B, Ex. 1 (Pl.'s Decl.) ¶¶ 7-10 & Ex. 3 (Plaintiff's Resume).  His recent experience, however, reflects a move away from work on mainframes towards Web-based applications.

35

Plaintiff states that he "was not asked any specific questions about [his] experience working with mainframe computer systems or in a large corporate environment." Pl.'s Opp'n, App. B., Ex. 1 (Pl.'s Decl.) ¶ 6. However, the first and second of the pre-selected questions posed to all applicants invited plaintiff to respond with just this sort of information. The questions sought information on plaintiff's "specific enterprise-wide business or educational software applications," the "software developer tools or programming languages" with which he was most comfortable, and whether he "used some of them recently." Def.'s Mot., Ex. A (Keyes Dep.), Dep. Ex. 8 (Panel Interview Rating Sheet). The interviewers certainly were not dissatisfied with plaintiff's responses, as Mr. Thompson awarded his response 4 points (exceeds the position's requirements) and Mr. Farfan awarded his response 3 points (meets all of the position's requirements). Id. Plaintiff's responses, however, showed that "[h]is experience was basically Web-based applications." Id., Ex. B (Farfan Dep.) 40:5-6. In contrast, Mr. Iqbal's responses prompted Mr. Thompson to note Mr. Iqbal's recent experience in a corporate environment and prompted Mr. Farfan to note his mainframe experience in their July 27, 2002 interview notes. See Def.'s Mot., Ex. A (Keyes Dep.), Dep. Ex. 2 (Panel Interview Rating Sheet and Interview Notes).

Plaintiff's focus on the importance of and questions asked about the applicants' relative corporate and mainframe experience does not serve to dispute the facts as DCPS presents them. There is evidence in the record that DCPS had an interest in hiring IT Specialists with mainframe experience and that Level 11 IT Specialists could be expected to use mainframes daily. It appears that plaintiff presented himself as a person with experience in principally Web-based

applications.  Plaintiff does not rebut DCPS' claimed rationale for hiring Mr. Iqbal on the strength of his corporate and mainframe experience.

### 3.  Ms. Wang

Plaintiff first notes that Ms. Wang did not apply for the Level 11 IT Specialist position; she applied only for the Level 12 position and was rejected.  However, according to DCPS, a person qualified for the Level 12 position automatically was qualified for the Level 11 position, Def.'s Mot., Ex. A (Keyes Dep.) 78:14-16, "so the fact that [the applicant] may or may not have applied for the [Level] 11" did not "bode ill" for her.  *Id.* (Keyes Dep.) 78:17.  Mr. Keyes had interviewed Ms. Wang himself, *see id.* (Keyes Dep.) 130:14-15, and found her a better match for DCPS because of her "specific HR PeopleSoft experience."  *Id.* (Keyes Dep.) 228:20-21.  None of the applicants for the Level 11 IT specialist position had PeopleSoft experience.  *Id.* (Keyes Dep.) 229:17-20.

Plaintiff also notes that Ms. Wang's interview scores were low.  There is evidence in the record, however, that the perceived deficiencies in Ms. Wang's experience pertained to her lack of leadership experience and her absence from the workplace while she started a family.  Although Ms. Wang may not have been a good candidate for a Level 12 position as a supervisor, DCPS deemed her skills and experience sufficient for a Level 11 position.

Again, plaintiff points to no evidence to rebut DCPS' stated rationale for offering the Level 11 position to Ms. Wang, and fails to demonstrate discrimination based on plaintiff's disability with the selection of Mr. Iqbal and Ms. Wang.

*E.  Mr. Keyes' Alleged Failure to Inform Plaintiff of the Status of his Application*

Plaintiff's responses to DCPS' interrogatories suggested that plaintiff considered Mr. Keyes' failure to inform plaintiff of the status of his application amounted to discrimination based on plaintiff's disability.  *See* Def.'s Mot. at 21.  Plaintiff does not pursue this argument in his pleadings, and the Court deems the matter conceded.  Furthermore, there is evidence in the record indicating that DCPS' Human Resources personnel, not Mr. Keyes, are responsible for contacting applicants and extending job offers.  *See* Def.'s Mot., Ex. A (Keyes Dep.) 82:19-22.

The Court "must respect the employer's unfettered discretion to choose among qualified candidates."  *Fischbach*, 86 F.3d at 1183 (citing *Ramey v. Bowsher*, 915 F.2d 731, 735 (D.C. Cir. 1990).  It cannot "serve as a 'super-personnel department that reexamines an entity's business decisions.'"  *Holcomb*, 433 F.3d at 897 (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).  Accordingly, the Court "decline[s] to second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982).

## VI.   CONCLUSION

For the reasons discussed herein, the Court concludes that plaintiff has failed to make out a *prima facie* case of discrimination based on his disability.  Assuming that he had made out a *prima facie* case, the Court concludes that he has failed to show from all the evidence presented that DCPS declined to offer him a Level 11 IT Specialist position because of his disability.  The Court will grant DCPS' summary judgment motion.  An Order consistent with this Memorandum Opinion will be issued separately.


_____ /s/ _____
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge
Date:   March 31, 2007